## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

BARRETT M. MOORE,                                  Case No. 1:14-cv-221
     Plaintiff,                                   Barrett, J.
                                                   Litkovitz, M.J.

    vs.

COMMISSIONER OF                                    **REPORT AND**
SOCIAL SECURITY,                                   **RECOMMENDATION**
    Defendant.

Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the final decision of the Commissioner of Social Security (Commissioner) denying

plaintiff's applications for disability insurance benefits (DIB) and supplemental security income

(SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 7), the

Commissioner's response in opposition (Doc. 14), and plaintiff's reply memorandum (Doc. 15).

## I. Procedural Background

Plaintiff filed applications for DIB and SSI in September 2010, alleging disability since

August 1, 2009, due to degenerative disc disease, heart problems, and eye disease. These

applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested

and was granted a *de novo* hearing before administrative law judge (ALJ) Larry A. Temin. At

the first ALJ hearing held on August 7, 2012, plaintiff and a medical expert (ME), Dr. Hugh

Savage, M.D., appeared and testified. A second ALJ hearing was held on September 21, 2012, at

which plaintiff, the ME, and a vocational expert (VE), appeared and testified. On November 13,

2012, the ALJ issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request

for review by the Appeals Council was denied, making the decision of the ALJ the final

administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act
> through December 31, 2014.

> 2. The [plaintiff] has not engaged in substantial gainful activity since August 1,
> 2009, the alleged onset date. (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

> 3. The [plaintiff] has the following severe impairments: mitochondrial
> disease/Kearns-Sayer syndrome/chronic progressive external opthalmoplegia with
> bilateral ptosis; atrial arrhythmia, status post pacemaker placement; lumbar spine
> degenerative disc disease/spondylosis, status post L4-L5 laminectomy; an
> affective disorder; and a pain disorder. (20 CFR 404.1520(c) and 416.920(c)).

> 4. The [plaintiff] does not have an impairment or combination of impairments that
> meets or medically equals the severity of one of the listed impairments in 20 CFR
> Part 404, Subpart P, Appendix 1. (20 CFR 404.1520(d), 404.1525, 404.1526,
> 416.920(d), 416.925 and 416.926).

> 5. After careful consideration of the entire record, the [ALJ] finds that the
> [plaintiff] has the residual functional capacity to perform sedentary work as
> defined in 20 CFR 404.1567(a) and 416.967(a). Specifically, the [plaintiff] can
> perform work activity except as follows: He can lift/carry/push/pull up to 10
> pounds occasionally and 5 pounds frequently. He can stand/walk for a total of 2
> hours in an eight-hour period (for 45 minutes at a time, and then must be able to
> sit for 1-2 minutes). He can sit for a total of 6 hours per eight-hour period (for 45
> minutes at a time, after which he must be able to stand for 1-2 minutes). The
> [plaintiff] can only occasionally climb ramps/stairs, stoop, kneel, and crouch. He
> can never climb ladders/ropes/scaffolds, crawl, or balance. The [plaintiff] can
> never use power tools or vibratory tools. He cannot operate automotive
> equipment, and he cannot work at unprotected heights or around hazardous

3

machinery. The [plaintiff] cannot perform work that requires significant peripheral vision. He is able to perform only simple, routine, repetitive tasks. He is able to remember and carry out only short and simple instructions. He is able to sustain concentration and attention for 2 hours at a time, and then requires a rest break of 5 minutes. His job should not require more than ordinary and routine changes in work setting or duties.

6. The [plaintiff] is unable to perform any past relevant work. (20 CFR 404.1565 and 416.965).[1]

7. The [plaintiff] was born [in] . . . 1974 and was 34 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English. (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the [plaintiff]'s past relevant work is unskilled. (20 CFR 404.1568 and 416.968).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform. (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from August 1, 2009, through the date of this decision. (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-29).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

---

[1] Plaintiff's past relevant work was as a home repairer. (Tr. 27).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform 1,650 unskilled sedentary jobs in the regional economy and 230,000 jobs in the national economy, such as assembler, packer or inspector. (Tr. 28, 70).

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

On appeal, plaintiff argues that the ALJ erred by: (1) fashioning a mental RFC that is not supported by substantial evidence; (2) failing to properly take plaintiff's vision problems into account when fashioning the RFC; (3) failing to evaluate the impact on plaintiff's functioning of

profound fatigue resulting from depression, mitochondrial disease, and Kearns-Sayre syndrome[3];
(4) failing to find that plaintiff's stenosis and right leg radiculopathy were severe impairments;
(5) failing to properly weigh the medical opinion evidence; (6) failing to properly assess
plaintiff's credibility; and (7) posing hypothetical questions to the VE that failed to account for
all of plaintiff's functional limitations. (Doc. 7). The Court has considered the assignments of
error in a different order than presented by plaintiff.

### 1. Weight given the medical source opinions (Fifth Assignment of Error)

Plaintiff alleges that the ALJ improperly weighed the medical opinion evidence. Plaintiff
specifically alleges that the ALJ erred by failing to give controlling weight to the opinions of his
treating physicians, Dr. Andrew W. Neff, M.D., and Dr. Lawson Wulsin, M.D., and by failing to
give good reasons for the weight given their decisions.

*i. Standard*

It is well-established that the findings and opinions of treating physicians are entitled to
substantial weight. "In general, the opinions of treating physicians are accorded greater weight
than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*,
127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.
1985) ("The medical opinions and diagnoses of treating physicians are generally accorded
substantial deference, and if the opinions are uncontradicted, complete deference."). "The
treating physician doctrine is based on the assumption that a medical professional who has dealt
with a claimant and his maladies over a long period of time will have a deeper insight into the
medical condition of the claimant than will a person who has examined a claimant but once, or

---

[3]Kearns-Sayre syndrome is a disease characterized by pigmentary retinal dystrophy, cardiomyopathy, and varied
cranial nerve impairment. http://medical-dictionary.thefreedictionary.com/Kearns-Sayre+syndrome.

6

who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. §§ 404.1527(c)(2)(i)(ii), 416.927(c)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent

7

reviewers the weight the adjudicator gave to the treating source's medical opinion and the

reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p, 1996 WL 374188 (1996)).

This procedural requirement "ensures that the ALJ applies the treating physician rule and permits

meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting

*Wilson*, 378 F.3d at 544).

Medical expert testimony consistent with the evidence of record can constitute substantial

evidence to support the Commissioner's decision. *See Atterberry v. Sec'y of Health & Human*

*Servs.*, 871 F.2d 567, 570 (6th Cir. 1989). Because a non-examining ME has no examining or

treating relationship with the claimant, the weight to be afforded the ME's opinion depends on

the degree to which the source provides supporting explanations for his opinions and the degree

to which his opinion considers all of the pertinent evidence in the record, including the opinions

of treating and other examining sources. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). *See also*

*Steagall v. Comm'r of Soc. Sec.*, -- F. App'x --, No. 14-3370, 2015 WL 64654, at *3 (6th Cir.

Jan. 6, 2015) (the ALJ must determine what weight to give the opinion of a non-treating

physician by applying the same factors applicable to a treating physician's opinion, i.e., the

opinion's supportability, its consistency, and the physician's specialization) (citing *Gayheart,*

710 F.3d at 379).

    *ii. Plaintiff's physical impairments*

Plaintiff's treating physician, Dr. Andrew Neff, M.D., gave two medical opinions related

to plaintiff's physical impairments. (Tr. 988-91, 1526). Dr. Neff completed a Medical

Assessment of Ability to Do Work-Related Activities (Physical) on March 23, 2012. (Tr. 989-

91). Dr. Neff reported that plaintiff has mitochondrial disease which causes muscular fatigue,

right leg radiculopathy and spinal disease. (Tr. 989). He assessed plaintiff as able to occasionally lift 10 pounds and frequently lift 0 pounds; stand/walk a total of 30 minutes out of eight hours; and sit a total of 15 minutes out of eight hours. (Tr. 989-90). Dr. Neff also opined that due to disc disease and right-sided radiculopathy, plaintiff can only occasionally climb, balance, stoop, crouch, kneel, and crawl. (Tr. 990). Dr. Neff found that seeing and fingering are affected because plaintiff "cannot see well" due to double vision caused by muscle changes in the eyes which require regular surgery. (*Id*.). Dr. Neff opined that plaintiff would more likely than not be absent from work three or more days each month because plaintiff "has a changing medical problem - mitochondrial disorder and eye problems that can change." (Tr. 991).

Dr. Neff subsequently prepared a letter dated September 19, 2012, in which he wrote that plaintiff has had "progressive problems with his eyes" and he has been diagnosed with Kearns-Sayre syndrome. (Tr. 1526). Despite multiple surgeries, plaintiff experiences "changing vision" with symptoms of double vision, limited eye movement, eye dryness, and right eye wandering. Plaintiff has atrial fibrillation issues that are uncontrolled with his current medication and which result in symptoms including fatigue, shortness of breath, and dizziness. Plaintiff has developed severe exercise intolerance due to his chronic pain. Plaintiff has degenerative disc disease of the lumbar spine "with narrowing issues of the spinal cord." (*Id*.). This causes chronic lumbar pain and severe nerve pain with numbness in his lower extremities. He cannot sit or stand for long periods of time due to the chronic pain and he has stability problems when standing or walking. Plaintiff also "has a mitochondrial disorder" that "leads to many problems related to muscle function throughout the body." (*Id*.).

The ALJ discounted Dr. Neff's assessments of plaintiff's functional limitations and gave "limited weight" to his opinions on several specified grounds. (Tr. 24). First, the ALJ acknowledged that Dr. Neff is a treating physician but noted that his contact with plaintiff has been "limited" as evidenced by the number of office visits documented in the Veterans Administration (VA) records. (*Id.*). The ALJ stated that it appeared Dr. Neff did not become plaintiff's primary care physician until sometime in 2012 or possibly late 2011. (*Id.*, citing Tr. 1459-1525). Second, the ALJ noted that Dr. Neff is a primary care physician who does not specialize in neurology, cardiology, ophthalmology or physiatry. (*Id.*). Third, the ALJ determined that the extreme functional limitations found by Dr. Neff were not supported by the evidence of record. (*Id.*). The ALJ found that Dr. Neff had not pointed to any "clinical and laboratory diagnostic techniques" upon which he relied in rendering his opinion, which appeared to be based primarily upon plaintiff's subjective complaints, and his opinion was not consistent with the other substantial evidence in the case record. (*Id.*). The ALJ found that Dr. Neff gave no indication that he had reviewed the records of plaintiff's treating specialists, none of whom imposed work-preclusive functional limitations or otherwise indicated that plaintiff is unable to work. (*Id.*). The ALJ adopted only the limitations which restricted plaintiff to occasional stooping, crouching and kneeling assessed by Dr. Neff, which the ALJ found to be consistent with the record. (Tr. 24-25).

Instead of crediting the treating physician's opinions, the ALJ gave "great weight" to the testimony of the ME, Dr. Hugh Savage, M.D., a cardiologist and internal medicine physician. (Tr. 26). Dr. Savage testified at two hearings before the ALJ. (Tr. 37-67, 101-123). At the first ALJ hearing, Dr. Savage testified that the medical records he reviewed did not include

10

examination findings showing motor weakness in the legs, atrophy, or loss of sensation in the right leg distribution. (Tr. 112). Dr. Savage also testified there was no EMG evidence that would suggest motor weakness or sensory abnormality. (Tr. 107). Dr. Savage noted that a CT scan of plaintiff's lumbar spine dated May 27, 2011, disclosed a finding of mild central canal stenosis, but there were no findings of muscle strength diminishment or sensory findings which would indicate the stenosis was functionally significant. (Tr. 113-14). Dr. Savage testified that an EMG would be helpful to determine whether plaintiff's stenosis was of any functional significance. (Tr. 114).

Subsequent to the first ALJ hearing, an EMG of the lower extremities was performed in August 2012, which showed evidence of "chronic right L5 and Sl radiculopathies, without signs of ongoing denervation," and a normal EMG of the left lower extremity. (Tr. 1528-29). Dr. Savage testified at the second ALJ hearing that he had reviewed the EMG and that although he is not a neurologist, he interpreted the EMG as showing no neuronal changes. (Tr. 38). Dr. Savage testified that the EMG, together with the other evidence in the record, showed that there is clinical radiculopathy but it is not so severe as to cause a positive straight leg raising reflex; rather, the values reflected on the EMG suggest that plaintiff has chronic radiculopathy at L5-Sl, without denervation, i.e., a low-grade radiculopathy. (Tr. 42-44). Dr. Savage also testified that October 2010 findings made by Dr. Ron Koppenhoffer, M.D., a rehabilitation and physical medicine specialist, of reduced range of motion, absence of right Achilles reflex, and decreased sensation involving the right SI dermatome, were consistent with the EMG. (*See* Tr. 564-65). Dr. Savage testified that Dr. Neff's assessment that plaintiff could only stand or walk for 30

minutes in an eight-hour day did not conform with the evidence as a whole and that plaintiff should be limited to sedentary work. (Tr. 61, 63-64).

In giving Dr. Savage's opinion "great weight," the ALJ found that Dr. Savage was a specialist in both internal medicine and cardiology and he had reviewed the entire record. (Tr. 26). The ALJ stated that according to Dr. Savage's testimony, the CT scan did not support any type of functional limitations; the EMG findings indicated no neurological issues with respect to the right leg; the findings supported clinical radiculopathy but not so severe as to cause a positive straight leg raise; and plaintiff's mitochondrial disease mainly affects his eyes and does not cause cardiac manifestations. (Tr. 26).

The ALJ also gave "some weight" to the opinion of the non-examining state agency reviewing physician, Dr. W. Jerry McCloud, M.D. (Tr. 22). Dr. McCloud reviewed the record in May 2011. (Tr. 144-46). He opined that due to back pain with decreased sensation, some weakness, some restricted range of motion, and pacemaker implantation, plaintiff could lift, carry, push/pull up to 20 pounds occasionally and 10 pounds frequently; sit about six hours in an eight-hour work day; and stand/walk about six hours in an eight-hour work day. (Tr. 144-45). Dr. McCloud assessed no postural limitations. Based on opthalmoplegia which restricts eye movement and prevents the two eyes from working together, Dr. McCloud restricted plaintiff from hazards including unprotected heights, commercial driving, and using or being around hazardous machinery. (Tr. 145). The ALJ found that the record as a whole supported more restrictive exertional and postural limitations than those assessed by Dr. McCloud but found his assessment of plaintiff's eye problem to be consistent with the record as whole. (Tr. 22).

12

Plaintiff alleges that the ALJ failed to weigh the opinions of Dr. Neff in accordance with the "treating physician" rule, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), and Social Security Ruling 96-2p. Plaintiff contends that the ALJ's decision to give less than controlling weight to the treating physician's opinions is not supported by substantial evidence because the ALJ did not consider all of the regulatory factors when weighing his opinions, and the reasons the ALJ gave for discounting Dr. Neff's opinions are not supported by substantial evidence. Plaintiff's arguments are not well-taken. A review of the ALJ's decision shows that the ALJ gave "good reasons" for declining to give the treating physician's opinions controlling weight and for giving those opinions only "limited weight." The record shows that consistent with the regulations, the ALJ discounted Dr. Neff's opinion based on the length and frequency of treatment; Dr. Neff's area of specialization; supportability of the opinion; and consistency with the record as a whole. (Tr. 24).

Plaintiff nonetheless alleges the reasons given by the ALJ are unsupported by the record or are invalid. Plaintiff notes that Dr. Savage never treated or examined plaintiff, and he is not a specialist in one of several areas involved in plaintiff's care. Plaintiff argues that the ALJ should have discounted his opinions for these reasons. In fact, however, the ALJ took into consideration both Dr. Savage and Dr. Neff's practice areas, noting that Dr. Neff was plaintiff's primary care physician and Dr. Savage is a cardiologist and an internal medicine physician. (Tr. 24, 26). Further, the ALJ considered the frequency of treatment or examination, noting that Dr. Neff's contact with plaintiff was limited and that Dr. Savage had reviewed the entire record. (*Id*.). Contrary to plaintiff's suggestion, the ALJ was not required to credit Dr. Neff's opinion simply because he had contact with plaintiff whereas Dr. Savage had never seen or treated plaintiff. *See*

13

20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded his opinion depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources); *Steagall*, No. 14-3370, 2015 WL 64654, at *3 (the ALJ must determine what weight to give the opinion of a non-treating physician by considering the opinion's supportability, its consistency, and the physician's specialization) (citing *Gayheart*, 710 F.3d at 379). Further, although plaintiff asserts that Dr. Neff necessarily reviewed plaintiff's entire medical file from the VA before issuing his September 2012 letter opinion (Doc. 7 at 13, citing Tr. 1526), in fact Dr. Neff did not indicate what evidence he reviewed before preparing his letter.

Further, the ALJ correctly found that Dr. Neff did not cite imaging or test results or other clinical or laboratory findings in support of his assessments; instead, Dr. Neff only generally referenced plaintiff's diagnoses of degenerative disc disease, mitochondrial disease or disorder, and Kearns-Sayre syndrome. (Tr. 989-91, 1526). The ALJ was entitled to discount Dr. Neff's opinion on this basis and to give more weight to the opinion of Dr. Savage, who discussed the objective test results and assessed plaintiff's functioning based in part on the results of those objective findings.[4] (Tr. 26). Plaintiff alleges that the ALJ nonetheless erred in this regard because the test results support findings of stenosis and radiculopathy as referenced by Dr. Savage, and the ALJ erred by failing to include these as severe impairments. (Doc. 7 at 12-13).

---

[4] Plaintiff faults Dr. Savage for failing to cite a Social Security ruling or regulation to show that positive straight leg raising was a determinative factor in discounting radiculopathy, but this is a medical matter and not a legal issue.

14

However, plaintiff's contention that the ALJ erroneously failed to characterize conditions found by Dr. Savage as severe impairments has no bearing on whether the ALJ erred by discounting Dr. Neff's opinions, which make no mention of objective test results or a diagnosis of stenosis.[5] (Tr. 988-91, 1526). Finally, plaintiff alleges that the ALJ erred by failing to discuss why he rejected a credibility assessment purportedly made by Dr. McCloud, the non-examining state agency physician.[6] (Doc. 7 at 12, citing Tr. 144, 156). Plaintiff alleges that if Dr. McCloud's assessment finding him credible is accepted, then plaintiff is necessarily disabled. In fact, however, Dr. McCloud assessed plaintiff as capable of performing a restricted range of light work. (Tr. 144-46). Further, the ALJ found plaintiff was more restricted than Dr. McCloud assessed him to be. The ALJ did not err in this regard.

A review of the ALJ's decision shows that the ALJ complied with the treating physician rule in weighing the medical source opinions related to plaintiff's physical impairments. The ALJ gave "good reasons" for the ultimate weight afforded the treating physician's opinions pertaining to his physical impairments, and those reasons are substantially supported by the evidence in the case record. *See Gayheart*, 710 F.3d at 376.

*iii. Plaintiff's mental impairments*

Plaintiff's treating psychiatrist, Dr. Wulsin, completed a mental impairment questionnaire in March 2012. (Tr. 993-98). He noted that he had treated plaintiff for the last two years and had seen him every two to three months. He listed plaintiff's diagnosis as major depression with a

---

[5] Dr. Neff did opine that right sided radiculopathy limits plaintiff to occasional climbing, balancing, stooping, crouching, kneeling, and crawling. (Tr. 990).
[6] It is not clear from the format of the agency forms whether it was Dr. McCloud who made the credibility assessment which plaintiff attributes to him. (*See* Tr. 144, 156).

15

current GAF[7] score of 50, which Dr. Wulsin indicated was the highest GAF over the past year.
(Tr. 993). Dr. Wulsin reported that plaintiff's depression was "exacerbated by poor pain
[management]; now much improved with better pain [management]." (*Id*.). Dr. Wulsin opined
that depression and anxiety magnified plaintiff's back pain and right leg/foot problems. (Tr.
996). Dr. Wulsin opined that plaintiff had marked restriction in activities of daily living;
moderate difficulties in maintaining social functioning; and marked difficulties in maintaining
concentration, persistence or pace. (Tr. 997). Dr. Wulsin also opined that plaintiff had
experienced four or more episodes of decompensation within a 12-month period, each of at least
two weeks duration. (*Id*.). Further, Dr. Wulsin opined that plaintiff had a medically documented
history of a chronic organic mental or affective disorder of at least two years' duration that has
caused more than a minimal limitation of ability to do any basic work activity, with symptoms or
signs currently attenuated by medication or psychosocial support, and a residual disease process
that has resulted in such marginal adjustment that even a minimal increase in mental demands or
change in the environment would be predicted to cause the individual to decompensate. (Tr.
997). He opined that plaintiff would miss more than four days of work per month due to his
impairments or treatment. (Tr. 998). Dr. Wulsin gave additional reasons why plaintiff would
have difficulty performing at a regular job on a sustained basis, noting chronic fatigue, atrial
fibrillation, depression, and chronic pain. (Tr. 998).

---

[7] A GAF (Global Assessment of Functioning) score represents "the clinician's judgment of the individual's overall
level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders
32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to
psychological, social, and occupational functioning." *Id*. The GAF scale ranges from 100 (superior functioning)
to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene,
or serious suicidal act with clear expectation of death). *Id*. at 34. The DSM-IV categorizes individuals with scores
of 41 to 50 as having "serious" symptoms. *Id*. at 32. Individuals with scores of 51-60 are classified as having
"moderate" symptoms. *Id*.

The ALJ gave Dr. Wulsin's assessment "limited weight" on several specific grounds. First, the ALJ found that Dr. Wulsin's opinion was not consistent with other substantial evidence in the case record. The ALJ noted that although Dr. Wulsin reported a high GAF score of 50 over the prior year, plaintiff had never been assigned a score that low by either Dr. Wulsin or Dr. Jennifer Perry, Ph.D., a VA psychologist who also treated plaintiff. (Tr. 25). To the contrary, the scores reported by Dr. Perry ranged from 52 at plaintiff's initial evaluation in February 2010 to 67 in May 2012. (*Id.*, citing Tr. 781, 2/16/10- GAF 52; Tr. 778, 3/8/10- GAF 54; Tr. 660, 5/17/10- GAF 55; Tr. 630, 8/19/10- GAF 56; Tr. 874, 12/7/10- GAF 56; Tr. 1452, 4/18/11- GAF 58; Tr. 1354, 11/30/11- GAF 59; Tr. 1300, 2/29/12- GAF 65; Tr. 1492, 5/30/12- GAF 67). In addition, the ALJ found that the treatment notes prepared by both Dr. Wulsin and Dr. Perry demonstrated a generally positive response to treatment, and the ALJ cited specific treatment notes to that effect. (Tr. 25, citing, e.g., Tr. 659, 5/17/10- Dr. Perry noted plaintiff was helping his parents around the house, he had gone to South Carolina for a vacation and was looking forward to a trip to North Carolina with his children, he planned on going to a more "upbeat" church soon, and his PHQ-9 scores[8] had improved since his initial visit in February). The ALJ acknowledged that some of the treatment notes indicated mood problems but the mental status examination findings did not show significant deficits. (Tr. 25). Finally, the ALJ noted that at plaintiff's last visit with Dr. Wulsin on July 19, 2012, Dr. Wulsin diagnosed plaintiff with dysthymia rather than major depression and opined that plaintiff's "[d]epressive symptoms are manageable: limited to a few down days, related to regrets over what he can no longer do." (Tr.

---

[8] The PHQ-9 is the depression module of the Patient Health Questionnaire (PHQ), which is "a self-administered diagnostic instrument for common mental disorders[.]" http://www.ncbi.nlm.nih.gov/pubmed/11556941. It "scores each of the 9 DSM-IV [Diagnostic and Statistical Manual] criteria as '0' (not at all) to '3' (nearly every day)." *Id.*

17

25, citing Tr. 1468).

Plaintiff alleges that the ALJ did not give good reasons for discounting Dr. Wulsin's opinion. Plaintiff contends that the ALJ was not entitled to consider the GAF scores reported by Dr. Wulsin when weighing his opinion because the SSA has determined that GAF scores are not a reliable indicator of an individual's mental RFC. (Doc. 7 at 14). Plaintiff correctly notes that the Commissioner has "declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) (quoting *Wind v. Barnhart*, 133 F. App'x 684, 691-92 n.5 (11th Cir. 2005) (quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). *See also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[A]ccording to the [Diagnostic and Statistical Manual's] explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning. . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place.") (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). However, plaintiff misconstrues the ALJ's purpose for citing the GAF scores reported by Dr. Perry. The ALJ did not cite the GAF scores to assess plaintiff's mental functioning. Rather, the ALJ cited the scores to show that Dr. Wulsin had not accurately reported plaintiff's treatment history. (Tr. 25). The ALJ was entitled to discount Dr. Wulsin's opinion for this reason.

Plaintiff also alleges that the ALJ erred by referencing his PHQ-9 scores when weighing Dr. Wulsin's opinion. (Doc. 7 at 14). Plaintiff alleges that the scores demonstrate disability by

18

showing problems with thinking and concentrating, low energy, and depression. (*Id*.).[9] As is the case with the GAF scores, plaintiff misunderstands the reason the ALJ referenced the PHQ-9 scores. The ALJ referenced the scores only in the context of a treatment note by Dr. Perry which indicated that the scores had improved since plaintiff's initial visit. (Tr. 25, citing Tr. 659). Plaintiff does not dispute that Dr. Perry's notes indicate improvement in the scores. The ALJ was entitled to rely on evidence indicating his mental health had improved to discount Dr. Wulsin's assessment.

The ALJ gave good reasons for discounting Dr. Wulsin's opinion finding marked mental limitations. Those reasons are substantially supported by the evidence of record. The ALJ did not err by giving "limited weight" to Dr. Wulsin's assessment of plaintiff's mental functioning.

*iiii. Conclusion*

The ALJ did not err in weighing the medical opinion evidence. Plaintiff's fifth assignment of error should be overruled.

**2. The ALJ did not err by failing to find that plaintiff's stenosis and right leg radiculopathy were severe impairments (Fourth Assignment of Error).**

Plaintiff alleges that the ALJ erred by failing to find his stenosis and radiculopathy were severe impairments. (Doc. 7 at 9-10). Plaintiff alleges that because the record includes objective tests documenting these conditions, the ALJ was bound to find they were severe impairments and to adopt the functional limitations assessed by Dr. Neff. Plaintiff alleges that the ALJ instead erroneously relied on the testimony of the ME, Dr. Savage, to assess plaintiff's functional

---

[9]Plaintiff also argues that the "few down days" plaintiff was reported to be feeling in 2012 would preclude him from performing the jobs identified by the VE, as would the moderate limitations in persistence and pace found by the ALJ (Doc. 7 at 14); however, these arguments have no bearing on whether the ALJ erred in weighing the medical source opinions and will be considered in connection with plaintiff's seventh assignment of error.

limitations.  Plaintiff alleges this was error because Dr. Savage apparently discounted the results of an EMG study based on the absence of positive straight leg raising.

In response, the Commissioner asserts that the ALJ did not commit an error at Step Two of the sequential evaluation process because the ALJ found lumbar spine degenerative disc disease to be a severe impairment, and the impairment can cause symptoms of spinal stenosis and radiculopathy, among others.  (Doc. 14 at 8, citing *Dorland's Illustrated Medical Dictionary*, 1595, 1795 (31st ed. 2007).  The Commissioner also alleges that assuming the ALJ committed an error at Step Two, any such error was harmless because the ALJ considered plaintiff's impairments at the remaining steps of the sequential evaluation process.  (*Id*. at 8-9).

The Step Two finding is a "*de minimis* hurdle" in the disability determination process. *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (citing *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1988)).  If an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, it must be deemed "severe."  *Id*. (citing SSR 96-3p (July 2, 1996)).  An erroneous finding at Step Two is harmless error where there is substantial evidence to support a finding of "not disabled" at a later step of the sequential evaluation process. *Id*. ("We are not required to remand where to do so would be an idle and useless formality.") (citing *Wilson,* 378 F.3d at 547) (quoting *NLRB v. Wyman-Gordon,* 394 U.S. 759, 766 n. 6 (1969)).

Here, assuming stenosis and radiculopathy are separate impairments from degenerative disc disease rather than symptoms of that impairment, any error the ALJ committed by failing to find stenosis and radiculopathy to be severe impairments at Step Two was harmless.  The ALJ elicited testimony pertaining to plaintiff's back impairment from the ME at two hearings.  The

record shows the ALJ thoroughly evaluated the ME's testimony and evidence of plaintiff's degenerative disc disease, including imaging findings, examination findings, objective evidence of radiculopathy, and EMG findings made following the first ALJ hearing. (Tr. 13-14, 19, 21-27). The ALJ found that lumbar spine degenerative disc disease/spondylosis, status post L4-L5 laminectomy, was a severe impairment (Tr. 12), and he limited plaintiff to a restricted range of sedentary work to account for plaintiff's symptoms from his back and other impairments. Although plaintiff disagrees with the ALJ's assessment of the medical opinion evidence, plaintiff points to no additional evidence showing functional limitations imposed by his stenosis and radiculopathy that the ALJ failed to take into account when formulating the RFC. Plaintiff's fourth assignment of error should be overruled.

### 3. The ALJ did not err by failing to properly account for plaintiff's vision problems when fashioning the RFC (Second Assignment of Error).

Plaintiff alleges as his second assignment of error that the ALJ erred by improperly evaluating the impact of plaintiff's vision problems on his functional capacity. (Doc. 7 at 8). Plaintiff acknowledges that the ALJ assessed a restriction against "work that requires significant peripheral vision" to account for plaintiff's vision impairments. (*Id.*, citing Tr. 12). However, plaintiff alleges that his visual impairments cause symptoms which would affect his ability to perform all of the jobs listed by the VE, which he asserts require "good sustained vision to perform." (*Id.* at 8). These symptoms include decreased distance and near vision, which plaintiff alleges Dr. Neff noted in his September 2012 letter opinion (Tr. 1526); double vision as noted by Dr. Neff in that same report (*Id.*); and sensitivity to bright lights as noted in a May 2011 treatment report (Tr. 1141). (Doc. 7 at 3, 8). Plaintiff suggests that the ALJ erred by adopting the ME's testimony pertaining to his vision impairments despite the fact that the ME is not an

ophthalmologist, but discounting Dr. Neff's opinion as to plaintiff's functional limitations in part because he is not a specialist in any of the fields at issue.  Plaintiff concludes that the ALJ erred by failing to find that double vision and "problems with bright lights" would preclude him from engaging in sustained work activity for 40 hours a week under Social Security Ruling 96-8p. (*Id.*).

The Commissioner alleges in response that the ALJ considered the reports related to plaintiff's eye impairments and accompanying symptoms and reasonably accommodated plaintiff's vision problems by limiting him to work that does not require significant peripheral vision.  The Commissioner asserts that according to plaintiff's testimony, he is able to see in front of him and a lack of peripheral vision is his only specific visual impairment.  (Doc. 14 at 7, citing Tr. 21-22, 86-87, 95-96).

In his April 2012 report, Dr. Neff opined that plaintiff cannot see well and he has double vision due to muscle changes in his eyes.  (Tr. 990).  Dr. Neff wrote in September 2012 that plaintiff has had multiple eye surgeries and "continues to have changing vision that causes double vision, limited eye movement, dryness of the eyes and [right] eye wandering."  (Tr. 1526). However, plaintiff did not identify double vision as a current problem at the ALJ hearing. Rather, he testified that he is able to look in front of him but he has no peripheral vision and his eyes do not move up or down.  (Tr. 86-87).  He testified that he had surgery to correct a problem where his vision was obscured by his eyelids, and the surgery helped but his vision remained somewhat obscured by his eyelids.  (Tr. 104-05).  In his written decision, the ALJ acknowledged plaintiff's history of eye problems and the results of an optometry consultation at the VA in March 15, 2010, which showed decreased near and distance vision.  (Tr. 20).  The ALJ noted that

22

plaintiff underwent eye surgery in 2011, following which he reported "some double vision" but improvement in his symptoms. (Tr. 21-22). The ALJ found based on this clinical evidence and plaintiff's testimony that plaintiff was limited to "work situations that do not require significant peripheral vision." (Tr. 22).

Plaintiff has not shown that the ALJ erred in evaluating his vision impairment. The ALJ considered the medical evidence related to plaintiff's eye impairments and plaintiff's testimony that he lacks peripheral vision, and the ALJ included a restriction against work requiring "significant peripheral vision" in the RFC finding to account for this symptom. (Tr. 18). Plaintiff has not identified additional functional limitations resulting from his vision impairments that are supported by the evidence and which the ALJ failed to include in the RFC finding. Plaintiff's second assignment of error should be overruled.

**4. The ALJ did not err by failing to properly evaluate the profound fatigue resulting from his mitochondrial disease, Kearns-Sayre syndrome, and depression (Third Assignment of Error).**

Plaintiff alleges as his third assignment of error that the ALJ erred by failing to evaluate the impact of his fatigue on his functional capacity. (Doc. 7 at 8-9, citing 20 C.F.R. §§ 404.1523, 404.1545(b)). Plaintiff alleges that fatigue is a symptom of his mitochondrial disease, Kearns-Sayre syndrome and depression. (*Id*. at 8). Plaintiff notes that the ALJ acknowledged his complaints of fatigue in the written decision, but plaintiff alleges that the ALJ erred by allegedly stating it was unclear in 2011 to what extent his fatigue was the result of a medical condition. (*Id*. at 8-9, citing Tr. 20-22). Plaintiff alleges that the ALJ erred by failing to evaluate his physical and mental impairments in combination and by failing to evaluate his fatigue in combination with "the pain (pain disorder and low back and leg pain from the stenosis and

radiculopathy)," which plaintiff alleges together prevent him from from sustaining work for 40 hours a week as found by his treating physician, Dr. Neff. (*Id*. at 9, citing Tr. 988-91, 1526).

In response, the Commissioner alleges that plaintiff has misread the ALJ's opinion to the extent he contends the ALJ erred by stating in was unclear what the cause of plaintiff's fatigue was in 2011. The Commissioner notes that the ALJ was quoting a conclusion by treating psychologist Dr. Perry when he made this statement and was not making his own finding. (Doc. 14 at 8). The Commissioner further contends that the ALJ's evaluation of plaintiff's complaints of fatigue depended on the ALJ's assessment of plaintiff's credibility, which the ALJ reasonably discounted. (*Id*., citing *Yeager v. Reliance Standard Life Ins. Co*., 88 F.3d 376, 382 (6th Cir. 1996)).

The ALJ noted plaintiff's complaints of fatigue made in conjunction with both his physical and mental impairments. (Tr. 19-22). The ALJ also considered Dr. Neff's opinion dated September 19, 2012, that plaintiff "continues to have atrial fibrillation issues [that are] uncontrolled with current medication," resulting in symptoms which include fatigue. (Tr. 24, citing Tr. 1526). However, as discussed above, the ALJ reasonably decided to give Dr. Neff's opinion as to plaintiff's functional limitations "limited weight" for reasons that are substantially supported by the record. (Tr. 24). Similarly, the ALJ considered the assessment of plaintiff's treating psychiatrist, Dr. Wulsin, who opined that plaintiff suffered from decreased energy and sleep disturbance, among other symptoms. (Tr. 25). However, the ALJ rejected Dr. Wulsin's opinion that plaintiff suffered from marked limitations and would miss more than four days of work each month for reasons that are substantially supported by the record. (*Id*.). Plaintiff has not identified additional functional limitations resulting from fatigue that are supported by the

24

evidence and which the ALJ failed to include in the RFC finding.  Plaintiff only generally alleges that fatigue is a symptom of his mitochondrial disease, Kearns-Sayre syndrome and depression and he does not point to any evidence in support of this contention, except to allege that the PHQ-9 scores noted by the ALJ show fatigue and very limited energy.  (Doc. 7 at 8-9, citing Tr. 25).  Plaintiff fails to acknowledge that the ALJ did not ignore the PHQ-9 scores but instead noted that improvement in the scores evidenced improvement in plaintiff's symptoms.  (Tr. 25, citing Tr. 659).  Plaintiff has not cited any evidence to the contrary.

Finally, plaintiff has not shown the ALJ erred by failing to consider how fatigue resulting from a combination of his impairments prevents him from performing sustained work activity.  "An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet" a listed impairment. *Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990).  Here, the ALJ found that plaintiff's severe impairments include, among others, mitochondrial disease/Kearns-Sayre syndrome, an affective disorder and pain disorder, all of which plaintiff alleges result in symptoms of fatigue.  (Tr. 12).  The ALJ further found that plaintiff did not have "a combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" (Tr. 13).  The ALJ's written decision shows that the ALJ considered the combined impact of plaintiff's physical and mental impairments.

For these reasons, plaintiff's third assignment of error should be overruled.

**5. The ALJ did not err by fashioning a mental RFC that is unsupported by substantial evidence (First Assignment of Error).**

Plaintiff alleges as his first assignment of error that the ALJ committed a number of errors in fashioning the mental RFC and that the mental RFC is not supported by substantial evidence. (Doc. 7 at 5-7). First, plaintiff alleges that the ALJ did not rely on a specific medical opinion to assess moderate limitations in concentration, persistence and pace. (*See* Tr. 16). Plaintiff notes that his treating psychiatrist, Dr. Wulsin, assessed "marked" limitations in this area (Tr. 997), and the ALJ discounted the opinions of the reviewing psychologist, Dr. Paul Tangeman, Ph.D., who assessed "mild" limitations. (Tr. 143). Plaintiff contends that the ALJ could not rely on the opinion of the ME, Dr. Savage, to assess his mental functioning because he is an internal medicine doctor. Plaintiff argues that because the ALJ did not adopt the mental restrictions imposed by one particular mental health source, the ALJ's "mental residual functional capacity cannot be reviewed now under [Social Security Ruling] 96-8p. . . ." (Doc. 7 at 7).

Plaintiff's argument is not well-taken. Medical sources render opinions on a claimant's RFC, but the ultimate responsibility for determining a claimant's capacity to work lies with the Commissioner. *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(B); *Nejat v. Comm'r of Soc. Sec.,* 359 F. App'x 574, 578 (6th Cir. 2009)). *See also* 20 C.F.R. §§ 404.1546(c), 416.946(c) (the responsibility for assessing a claimant's RFC lies with the ALJ). It is the ALJ's duty to fashion an RFC based on all of the evidence of record. The ALJ thoroughly explained his reasons for rejecting the marked limitations assessed by Dr. Wulsin and for assessing greater limitations than those found by the non-examining psychologist. (Tr. 16, 25). The ALJ did not err by failing to adopt the precise limitations assessed by any one

mental health source.

Second, plaintiff alleges that even if the ALJ properly assessed only moderate limitations, the ALJ did not adequately account for limitations on persistence or pace in the RFC finding. (Doc. 7 at 6, citing Tr. 18). Plaintiff's argument is not well-taken. The ALJ included the following mental restrictions in the RFC finding:

> He is able to perform only simple, routine, repetitive tasks. He is able to remember and carry out only short and simple instructions. He is able to sustain concentration and attention for 2 hours at a time, and then requires a rest break of 5 minutes. His job should not require more than ordinary and routine changes in work setting or duties.

(Tr. 18). Plaintiff has not cited any authority to support an argument that these restrictions are insufficient to support moderate limitations in persistence or pace.

Third, plaintiff argues that he cannot perform the jobs listed by the VE because all of those jobs require persistence and pace to perform. (Doc. 7 at 5-6). The Court will consider this argument in connection with plaintiff's allegation of a Step Five error (the seventh assignment of error).

Fourth, plaintiff alleges that the ALJ erred by noting "pain disorder" but not its characteristics. (*Id*. at 6, citing *Minor v. Comm'r*, 513 F. App'x 417, 435-36 (6th Cir. 2013) (discussing pain disorder)). Plaintiff alleges that the disorder further impedes his ability to perform sustained work activity. However, plaintiff does not point to any evidence to show what the symptoms of his pain disorder are and what mental functional limitations the pain disorder imposes. The evidence does not show that plaintiff's pain disorder imposes greater functional limitations than those included in the ALJ's RFC finding. *See Lee v. Comm'r of Social Sec*., 529

F. App'x 706, 713 (6th Cir. 2013) ("not every diagnosable impairment is necessarily disabling")

(citing *Higgs*, 880 F.2d at 863). Plaintiff's argument is not well-taken.

Fifth, plaintiff alleges that the ALJ erred by citing his GAF scores in his written decision.

(Doc. 7 at 6, citing Tr. 25). Plaintiff alleges that the ALJ is precluded from relying on GAF

scores to establish his mental RFC. Plaintiff further alleges that his scores do not show the

ability to perform substantial gainful activity on a sustained basis. (*Id*.). Plaintiff's arguments

are not well-taken. As explained in connection with plaintiff's fifth assignment of error, the ALJ

did not rely on the GAF scores to establish plaintiff's mental RFC. (*See* Tr. 25). Nor did the

ALJ equate plaintiff's GAF scores with the ability to do sustained work activity. Rather, the ALJ

recounted the GAF scores to demonstrate that plaintiff's treating psychiatrist, Dr. Wulsin, had

not accurately reported plaintiff's treatment history. (Tr. 25). The Court finds no error in the

ALJ's consideration of the GAF scores for this purpose.

Finally, plaintiff alleges that the ALJ failed to take into consideration certain evidence:

specifically, the elevated PHQ-9 scores reported in July 2012 which indicated that he displayed

problems with thinking and concentrating, lack of energy, and depression, and Dr. Wulsin's July

19, 2012 treatment note reporting that plaintiff had "a few down days." (Doc. 7 at 7, citing Tr.

25). Plaintiff alleges that if he has a few down days each month, he could not perform the jobs

identified by the VE. (*Id*., citing Tr. 70- hypothetical individual cannot miss more than 2 days of

work each month). Plaintiff also contends that in order to find his depression has improved, the

ALJ must note the baseline from which the improvement is measured. (*Id*., citing *Boulis-Gasche

v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011) (substantial evidence did not

support finding that the plaintiff's mental impairment had subsided; the ALJ "made no inquiry

into the degree of improvement, or from what baseline Plaintiff had improved.").

Plaintiff's arguments are not well-taken. There is no indication in the record that the

"few down days" plaintiff was reported to be experiencing in July 2012 were debilitating in any

sense. To the contrary, Dr. Wulsin reported at that time: "Depressive symptoms are manageable:

limited to a few down days, related to regrets over what he can no longer do." (Tr. 1468). Dr.

Wulsin diagnosed plaintiff with "dysthymia, improving with better pain [management] and better

social support." (*Id.*). Thus, the record does not support plaintiff's contention that he would be

unable to perform the jobs identified by the VE because of days missed due to his mental health

symptoms. Plaintiff does not point to any other evidence to show that his mental impairments

imposed functional limitations that the ALJ failed to take into account when fashioning the RFC.

Moreover, contrary to plaintiff's argument, the ALJ did not err by failing to note the baseline

from which the noted improvement in plaintiff's mental health symptoms was to be measured.

(Doc. 7 at 7). The ALJ thoroughly discussed the evidence which demonstrated an improvement

in plaintiff's mental health symptoms (Tr. 15, 25), and his finding that plaintiff's mental

functioning improved with treatment is substantially supported by the evidence.

Accordingly, the ALJ did not err in evaluating plaintiff's mental impairments and

fashioning an RFC that accounted for the functional limitations imposed by those impairments.

Plaintiff's first assignment of error should be overruled.

**6. The ALJ did not err by improperly assessing plaintiff's credibility (Sixth
Assignment of Error).**

Plaintiff alleges as his sixth assignment of error that the ALJ erred by failing to consider

all of the regulatory factors in assessing his credibility. (Doc. 7 at 15, citing 20 C.F.R. §

404.1529, SSR 96-7p). Plaintiff acknowledges that the ALJ relied on a lack of objective medical

findings and certain inconsistencies in plaintiff's testimony to discount his credibility. (Doc. 7 at

15). However, plaintiff contends that the inconsistencies are not material and do not demonstrate

an ability to perform sustained work activity for 40 hours each week. Plaintiff alleges that his

compliance with treatment and credibility assessments by various medical sources weigh in favor

of a finding that he is credible. (*Id*. at 15-16).

Title 20 C.F.R. §§ 404.1529 and 416.929 and Social Security Ruling 96-7p describe a

two-part process for assessing the credibility of an individual's statements about symptoms,

including pain. First, the ALJ must determine whether a claimant has a medically determinable

physical or mental impairment that can reasonably be expected to produce the symptoms alleged;

second, the ALJ must evaluate the intensity, persistence, and functional limitations of those

symptoms by considering objective medical evidence and other evidence, including: (1) daily

activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3)

precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any

medication taken to alleviate pain or other symptoms; (5) treatment, other than medication,

received for relief of pain or other symptoms; (6) any measures used to relieve pain or other

symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or

other symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p. "[A]n ALJ's findings based

on the credibility of the applicant are to be accorded great weight and deference, particularly

since an ALJ is charged with the duty of observing a witness's demeanor and credibility.

Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial

evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y of Health and Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987)).

Here, the ALJ thoroughly evaluated plaintiff's credibility and gave detailed reasons for discounting plaintiff's credibility. (Tr. 26-27). The ALJ reasonably relied on contradictions between the medical reports and plaintiff's subjective reports to find plaintiff was less than fully credible. *See Walters*, 127 F.3d at 531-32; *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004). Specifically, the record did not include objective findings which documented plaintiff's complaints of severe pain, such as muscle atrophy, moderate to severe sensory deficits, or a decrease in strength. (Tr. 521, 868, 888). In addition, straight leg raising was negative. (Tr. 521). Moreover, on numerous occasions, plaintiff's gait was observed to be normal. (Tr. 521, 565, 609, 703, 816, 883, 965). The record also included the results of objective tests that were inconsistent with plaintiff's complaints of pain. (*See* Tr. 26-27). Further, Dr. Linda Wyatt, M.D., a neurologist with the VA, opined in July 2011 based on the medical findings that plaintiff's complaints of right leg numbness and radiculopathy were "not medically credible." (Tr. 1270). In addition, plaintiff's report in July 2011 that he could walk for one-half to one mile and stand for "a couple of hours" was inconsistent with his claimed functional capacity. (Tr. 1266). This evidence substantially supports the ALJ's finding that plaintiff's allegations of debilitating pain and fatigue were not fully credible.

The ALJ's credibility finding is supported by substantial evidence and is entitled to deference. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (citations omitted). Plaintiff's sixth assignment of error should be overruled.

**7. The ALJ did not err by posing hypothetical questions to the VE that failed to account for all of plaintiff's functional limitations (Seventh Assignment of Error).**

Plaintiff alleges that the ALJ erred at Step Five of the sequential evaluation process by posing improper hypotheticals to the VE that omitted limitations which were purportedly supported by the evidence. (Doc. 7 at 16). At this step of the sequential evaluation process, the burden of proof shifts to the ALJ to show "by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (internal quotation marks omitted). "[S]ubstantial evidence may be produced through reliance on the testimony of a vocational expert [] in response to a hypothetical question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments." *Id*. at 512-13 (internal quotation marks omitted).

Here, plaintiff contends that the hypothetical questions that the ALJ posed to the VE were improper because they did not include: moderate limitations in persistence or pace as found by the ALJ (Tr. 13); the need to miss two days of work each month due to pain, fatigue and depression; the need to alternate positions after sitting or standing more than 45 minutes as purportedly found by Dr. Neff; the "supported mental limitations of Dr. Wulsin"; and problems with near vision and double vision, which plaintiff alleges would preclude him from performing 40 hours of sustained work activity each week. (Doc. 7 at 16). However, plaintiff has not pointed to any portions of the record to show that such limitations are supported by the medical and other evidence and that the ALJ erred by omitting any such limitations from the

hypotheticals posed to the VE.  For the reasons discussed earlier, the ALJ was not required to credit the limitations assessed by Drs. Neff and Wulsin, and plaintiff has failed to show that the RFC formulated by the ALJ is not substantially supported by the evidence.  Thus, the VE's testimony premised on the RFC finding constitutes substantial evidence in support of the ALJ's finding at Step Five of the sequential evaluation process.  Plaintiff's seventh assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.


Date:  2/11/15                          s/Karen L. Litkovitz
                                        Karen L. Litkovitz
                                        United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

BARRETT M. MOORE,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:14-cv-221
Barrett, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).